UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SHELBY JENSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:22-cv-1100-JRS-CSW |
| | ) | |
| LOWE'S HOME CENTERS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## Order on Evidentiary Motions

This is a negligence case.  This matter is before the Court on Defendant's Motion to Limit or Exclude Certain Aspects of Shirley Daugherty's and Sara Ford's Anticipated Expert Testimony ("*Daubert* Motion"), (ECF No. 112); Defendant's Motions in Limine, (ECF No. 121); and Plaintiff's Motions in Limine, (ECF No. 122). The Court will address each in turn.

## I.   Defendant's *Daubert* Motion (ECF No. 112)

The Court finds that the testimony of Shirley Daugherty is admissible in its entirety, as is the testimony of Sara Ford.  Defendant's *Daubert* Motion is **denied**.

## 1. Legal Standard

Expert testimony that is based on unwarranted assumptions should be excluded. *Target Market Publishing, Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1143–44 (7th Cir. 1998). The legal standard for reviewing the admissibility of expert testimony is well-established:

> It is a three-step analysis: the witness must be qualified 'as an expert by knowledge, skill, experience, training, or education'; the expert's reasoning or methodology underlying the testimony must be scientifically reliable; and the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue. In determining reliability, *Daubert* also sets forth the following non-exhaustive list of guideposts: (1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the theory has been generally accepted in the scientific community.

*Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007) (citing *Daubert v. Merrell Down Pharms., Inc.*, 509 U.S. 579, 592–94 (1993) and Fed. R. Evid. 702). This standard applies to all expert testimony; not only scientific testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 158 (1999).

While the district court acts as a "gatekeeper" to determine whether the expert witness's methods are valid, the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (citing *Daubert*, 509 U.S. at 595).

## 2. Shirley Daugherty

Shirley Daugherty is a life care plan nurse.  She is a registered nurse and has been working in the nursing field for several decades.  (Daugherty CV 1, ECF No. 112-1.)  Daugherty prepared a cost projection for Jenson's future medical treatment.  Lowe's does not challenge Daugherty's qualifications.  (Def.'s Second Supplemental Br. 5, ECF No. 152.)  Rather, Lowe's argues that "the entirety of Daugherty's report

and expert testimony should be deemed inadmissible because her methodology, as applied to this case, is scientifically unreliable." (*Id.* at 3.)  Alternatively, Lowe's seeks to limit Daugherty's testimony to exclude certain cost projections within her report on the grounds that they are not supported by sufficient medical evidence. Lowe's argues that because Daugherty did nothing more than review the medical records, her methodology is not rigorous enough for her testimony to be admitted. (*Id.* at 4.)

Jenson argues that Lowe's applies the incorrect standard of rigor to Daugherty's testimony.  Daugherty is providing not a life care plan but a cost projection report, which is an "abbreviated" version of a life care plan that does not involve any treatment recommendations but rather solely calculates the cost of care based on an individual's medical records.  (Pl.'s Opp. 5, ECF No. 155.)  Daugherty's methodology involves summarizing the medical records to create a list of treatments recommended by the individual's medical providers as well as her knowledge and experience as a nurse life care planner, then searching for the costs of the treatment.  (Daugherty Dep. 37, ECF No. 158-5.)  Daugherty also uses her own expertise as a registered nurse and her "experience with similar types of injuries, [and] preparing cost projections and life care plans for similar types of injuries," along with recommendations or requests from counsel.  (*Id.*)  Daugherty testified that she "rarely" collaborates with treating physicians when preparing her cost projections; although sometimes she does work with the plaintiffs in cases she participates in, she generally does so only

in scenarios where the records are incomplete or the plaintiff has not been treated for a long time, neither of which was the case here.  (*Id.* at 23.)

The Court agrees with Jenson on how to assess Daugherty's testimony.  Much of Lowe's challenge speaks of Daugherty's "recommendations" and suggests that Daugherty is the one prescribing the treatments listed in the cost projection report or otherwise determining that the treatments are appropriate.  However, Daugherty's cost projection is only that: a projection of costs.  Although Daugherty included items that, based on her experience as a registered nurse and life care planner she believed Jenson may need, the specific items challenged by Lowe's do not fall under this umbrella.  (*See* Daugherty Dep. 41, 53, ECF No. 158-5.)  Because Daugherty is not providing an actual treatment plan but merely costs to implement the plan set forth in Jenson's medical records, it is appropriate that her opinion was based on the medical records only rather than on interviews with Jenson or her providers.  However, any enumerated cost with no basis in the medical record or Daugherty's own experience as a registered nurse cannot be included as expert testimony.

### i.  T-CAR+ and P+ with Pziowave Therapy

Lowe's challenges the cost projection of T-CAR+ and P+ with Pziowave therapy, which was recommended by Jed Pence, a provider of biomechanical therapy with whom Jenson has been working.  (Def.'s Second Supplemental Br. 5–9, ECF No. 152.) Daugherty testified that she included this in the cost projection because this is part of the treatment that Jenson is currently receiving and was prescribed to Jenson by Jed Pence.  (Daugherty Dep. 53, ECF No. 158-5.)  In Daugherty's notes from the

October 27 Independent Medical Examination with Edward Negovetich, M.D., Daugherty wrote that Jenson told Dr. Negovetich that Jenson was receiving biomechanical therapy and noted that "Dr. Negovetich thought her current frequency seemed to be effective for her and would see no reason why she should discontinue it." (Life Care Plan 50, ECF No. 112-2.)  Daugherty testified that she understood this to be an endorsement from Dr. Negovetich.  (Daugherty Dep. 90, ECF No. 158-5.) Although Dr. Negovetich and Joseph Smucker, M.D. were unfamiliar with the therapies, (Negovetich Dep. 83, ECF No. 112-8.;Smucker Dep. 44, ECF No. 112-3), whether they endorsed Pence's biomechanical therapy goes to weight rather than admissibility; any impact of this on Daugherty's testimony should be evaluated by the jury.

Lowe's argues that Daugherty's pricing methodology is faulty because she "admitted that she had not reviewed any medical records or bills associated with any biomechanical therapy or T-Car+ and P+ with Pziowave treatment; instead, she relied upon a singular email that was sent by Mr. Pence to Ms. Jenson's counsel detailing his recommended frequency of said treatment and pricing." (Def.'s Second Supplemental Br. 9, ECF No. 152.)  However, Daugherty did not review any medical records or bills regarding this treatment because there are none—this is merely a recommendation of future treatment.  (Daugherty Dep. 55, ECF No. 158-5.)  She instead reviewed the recommended treatment from Pence and the costs he provided, just as she would do with all the other treatments listed in her cost plan.  Lowe's is

free to question this on cross-examination, but this is not an unreliable methodology that renders Daugherty's testimony on this inadmissible.

### ii. Kyphoplasty and/or vertebroplasty

Lowe's argues that "Daugherty's cost projection regarding Plaintiff's future vertebroplasty or kyphoplasty is not supported by any medical evidence presented in the record and is therefore inadmissible." (Def.'s Br. 6, ECF No. 113.) Vertebroplasty is a spinal surgery that involves "[s]tabilization of a fractured vertebral body by injection of a surgical cement." *Vertebroplasty*, *Stedmans Medical Dictionary* (2014). Kyphoplasty is another kind of spinal surgery that involves "[i]njection of bone cement into a compressed vertebra." *Kyphoplasty*, *Stedmans Medical Dictionary* (2014). Specifically, Lowe's argues that the "cost projection is more than an extrapolation" since the particular surgeries were not recommended by Plaintiff's doctors and may not even occur. (Def.'s Br. 6, ECF No. 113.) Actually, Dr. Smucker testified that Plaintiff was not a candidate for either surgery, (Smucker Dep. 47, ECF No. 112-3), and Jay Nathan, M.D., told Plaintiff that back surgery was "unlikely to relieve her symptoms and resulted in exposure to risk of immediate and long-term complications," (Daubert Mot. Ex. 2 at 31, ECF No. 112-2).

Daugherty testified that it was "not [her] opinion that [Jenson] would need" either surgery but that Plaintiff, through her counsel, asked her to put them into the cost projection. (Daugherty Dep. 84, ECF No. 158-5.) This request was based on Dr. Negovetich's opinion that it was "possible" that Jenson would be a candidate for surgery. (Pl.'s Opp. 9, ECF No. 155; *see also* Dr. Negovetich IME 12, ECF No. 112-4.)

Daugherty's cost method is not any less reliable based on who requested the estimate; the cost of treatments that Plaintiff may seek in the future are relevant and admissible. Any doubt Lowe's has as to the value of this testimony can be addressed on cross-examination. Therefore, Daugherty's testimony regarding kyphoplasty and vertebroplasty is admissible.

### iii.  Orthotics and prescription medication

Lowe's also challenges Daugherty's inclusion of orthotics and prescription medication as unsupported by the medical record. (Def.'s Second Supplemental Br. 10–11, ECF No. 152.) Neither challenge has merit.

Lowe's is concerned that Daugherty did not know whether Jenson wears orthotics. (*Id.* at 10.) Daugherty included orthotics in her cost projection based on Dr. Negovetich's recommendation. (Daugherty Dep. 40, ECF No. 158-5.) Therefore, this is supported by the medical record; any question of whether Jenson actually wears orthotics will go to weight rather than admissibility.

The same is true of the prescription medications. Daugherty included this cost based on Dr. Negovetich's recommendation that Jenson should take these medications, indefinitely, so long as they are helpful to Jenson. (*Id.* at 66; Cost Projection 36–37, ECF No. 112-2.) She testified that it did not matter whether Dr. Smucker agreed with this recommendation; it would be included in the cost projection either way because Dr. Negovetich recommended the medications. (Daugherty Dep. 67, ECF No. 158-5.) That Daugherty assumed Jenson would take a medication for the remainder of her life also goes to weight rather than admissibility. Even if

Jenson's doctors have not definitively recommended lifetime use of a medication, Daugherty's summary of the medical record noted that Dr. Negovetich recommended helpful medications be prescribed "indefinitely."  (Cost Projection 36–37, ECF No. 112-2.)  Therefore, this assumption on Daugherty's part is appropriate in a cost projection because it reflects the indefinite nature of the recommendation.  It is for the jury to evaluate whether Jenson should be awarded damages for lifetime use or not.

Daugherty's testimony regarding the cost projection for orthotics and prescription medication is admissible.

### 3.  Sara Ford

Sara Ford is a vocational economic analyst at Vocational Economics, Inc. ("VEI"). (Ford Dep. 5, ECF No. 158-3.)  Ford prepared a Vocational Economic Assessment for Jenson that estimated Jenson's worklife expectancy, or the remaining number of years she is expected to work after age 25, and her lifetime loss in earnings as a result of her injuries.  As with Daugherty, Lowe's does not question Ford's qualifications, but rather argues that Ford's calculation "is based exclusively on the perceived decrease in Ms. Jenson's worklife expectancy based on a flawed methodology," and therefore "her opinion on the determination of 'work disability' lacks sufficient reliability and validity," as do her calculations.  (Def.'s First Supplemental Br. 7, ECF No. 137.)

Jenson argues that Ford's testimony passes the *Daubert* test and that Lowe's "merely disagrees with Ms. Ford's conclusion and her interpretation of certain

evidence in Ms. Jenson's medical records." (Pl.'s Opp. 12, ECF No. 155.) The Court finds that Ford's methodology is reliable and that her testimony is admissible in its entirety.

Ford's Vocational Economic Assessment of Jenson was prepared according to the Vocational Economic Rationale (the "Rationale"), which "presents both the philosophy and the methodology employed in" her economic assessment. (Ford Report 9, ECF No. 112-7.) First, Ford developed a profile of Jenson. She reviewed several pieces of information, including Jenson's W-2s, paystubs, and medical records including Dr. Negovetich's Independent Medical Examinations and Dr. Smucker's report. (*Id.* at 2–3.)

Next, Ford evaluated national statistics on both disability generally and specifically on how disability impacts an individual's work ability. For disability generally, Ford used data from the American Community Survey ("ACS"), an annual survey conducted by the United States Census Bureau, which is the largest survey of its kind. (*Id.* at 13.) The data is used by public and private entities alike. (*Id.*) For data relating to employment disability specifically, Ford analyzed data from the Annual Social and Economic Supplement ("ASEC"), which is also from the United States Census Bureau. (*Id.*) The ASEC "does not consider specific types of impairment or disability, but instead focuses on whether the individual has work-related limitations because of a physical or mental impairment that limits the individual in terms of performing work." (*Id.* at 16.) Ford's report is clear that this

is not a measure of whether an individual has a disability; it is purely a measure of an individual's work limitations. (*Id.*)

Notwithstanding Lowe's assertion that surveys are unreliable, ACS and ASEC data are widely used by public health researchers, economic analysts, and forensic experts such as those who provide vocational assessments. (*Id.* at 18, 33–34.) Because of the large sample size, the data is statistically more reliable, and the potential rate of error is low. (*Id.* at 36.) Ford also stated that a previous version of the Rationale has been published in a peer reviewed journal, as has support for the Rationale. (*Id.* at 10.)

The ASEC work disability criteria are based on seven questions. (*See* Fig. 3, *id.* at 16.) Three of the questions are labeled as "Not Severe"; the other four are labeled as "Severe." One of the "Not Severe" ASEC questions is "Does anyone in this household have a health problem or disability which prevents them from working or which limits the kind or amount of work they can do?" If the respondent answers "yes" to this question but "no" to all of the "Severe" questions, they are classified as not severely work disabled. (*Id.* at 17.)

The ACS asks six questions to determine whether an individual has a mobility, cognitive, hearing, vision, or physical disability. These questions are reproduced in Ford's report. (*Id.* at 15 Fig. 2.) With ACS data, "averages can be looked at by type of disability, such as physical or cognitive, which would be appropriate for those persons meeting the definitions noted previously. Through isolation or combination

of these varying disability types, an analysis can be customized to meet the specifics of a particular case." (*Id.* at 26.)

Defendant's motion focuses on Ford's (1) use of the term "nonsevere disability" and (2) use of an average to calculate Jenson's worklife expectancy. Ford found that Jenson could answer "yes" to the physical disability question on the ACS but "no" to the other disability questions. (*Id.* at 7; Ford Dep. 58–60.) For the category of "people who answer 'yes' to the physical disability question but 'no' to the others," Ford and others use the shorthand "nonseverely disabled." (Ford Dep. 54, ECF No. 158-3.) While Defendant argues otherwise, "nonseverely disabled" is not a category of survey respondent or any other prescriptive identifier. Thus, contrary to Defendant's argument that Ford created a third category of respondent, Ford did not diagnose Jenson with a "nonsevere disability." Rather, "nonseverely disabled" is merely a term used to describe the group of people who answered the disability questions in a particular way. This does not impact Ford's methodology and is not a reason for excluding her testimony.

The Court finds that the use of an average is a reliable methodology that uses the publicly available statistics combined with Ford's review of Jenson's history to estimate Jenson's lost earnings with the greatest accuracy. In her analysis, Ford has (1) a portrait of Jenson, which includes her education, work experience, current employment, current injuries, and current work limitations; and (2) national statistics on employment prospects culled from the ACS that can be filtered based on how respondents answer particular questions about their disability or disabilities.

Ford's task in preparing a vocational assessment is to see where Jenson, with her particular characteristics, best matches up with individuals in the data set. Ford found that based on Jenson's employment, injuries, and work limitations, her expected worklife is less than that of the average nondisabled person, but greater than that of an average nonseverely disabled person. Therefore, neither "nondisabled" nor "disabled" provides an accurate picture. Instead, Ford estimated that Jenson's worklife expectancy after the Incident "is like that of an average female[] with a baccalaureate degree who is the average of an individual with no disability and one with a nonsevere physical disability." (*Id.* at 7.) This is why she used the average of those two categories when calculating Jenson's potential lost earnings. This better assists the jury than a calculation based only on someone who answered "yes" to the physical disability question but "no" to the others, because this category does not match as closely Jenson's likely worklife expectancy.

Lowe's complains "[i]t would be impossible for any forensic economist to explore the validity and reliability of" Ford's calculations. (Def.'s First Supplemental Br. 7, ECF No. 137.) But, Ford explained her methodology in detail in her report, notably in the "Worklife Expectancy" section, and noted that a previous version of the Rationale used has been published in a peer reviewed journal, as has support for the Rationale itself. (Ford Report 10, 23–26, ECF No. 112-7.) That Ford uses software and formulas to analyze the raw statistics pulled from the Census Bureau does not render this process unrepeatable. (*See* Ford Dep. 32, ECF No. 158-3.) Computing averages and controlling for variables is standard data analysis. That another

analyst might define some variables differently or come to different conclusions about Jenson's limitations does not impact the reliability of Ford's methodology.

It seems, though, that Lowe's clarified at the final pretrial conference that its complaint goes to the lack of transparency of the formulas used to make the calculations. If so, and upon Lowe's request to Ford, Ford **is ordered to produce** to Lowe's within three (3) business days of such request, the mechanics of the calculation such that any formulas are visible and can be reviewed by Lowe's. Lowe's motion to limit or exclude Sara Ford's testimony is **otherwise denied**.

## II.   Defendant's Motions in Limine (ECF No. 121)

"A motion in limine is merely a 'pretrial request that certain inadmissible evidence not be referred to or offered at trial.'" *Empire Bucket, Inc. v. Contractors Cargo Co.*, 739 F.3d 1068, 1071 (7th Cir. 2014) (quoting Black's Law Dictionary 1109 (9th ed. 2009)). Evidence should be excluded at this stage only if it is "clearly not admissible for any purpose." *Barnes v. General Motors LLC*, 2023 WL 3436098, at *1 (S.D. Ind. May 12, 2023) (citing *Hawthorne Partners v. AT&T Techs., Inc.*, 831 F. Supp. 1398, 1400–01 (N.D. Ill. 1993)). A denial at this stage does not mean the evidence is certain to be admitted. All other evidentiary rulings will be made at trial subject to the Parties' offers and objections.

Lowe's seeks to exclude the following evidence:

## 1. Defendant's MIL No. 1: Settlement negotiations

An offer to compromise or settle a claim is not admissible to prove liability. Fed. R. Evid. 408. Jenson does not object. Defendant's Motion in Limine No. 1 is **granted**.

13

2.  **Defendant's MIL No. 2:  Evidence regarding the filing of motions in limine, any pre-trial discovery disputes, and/or motions, including motions to extend deadlines or continue the trial and motions to dismiss claims**

Lowe's argues that discovery disputes are not relevant to the jury's determination and would be unfairly prejudicial because they could be used to raise suspicion that the party seeking exclusion is trying to hide something.  Further, any evidence relating to the merits of the claims that were dismissed against Scotts Company and/or Scotts Live Goods is irrelevant, would be unduly prejudicial, would confuse the jury, and would waste time.

Jenson objects only as to the discovery dispute specifically related to Jenson's belief that Lowe's was withholding documents relevant to the punitive damages claim.  Jenson requests that the Court reserve ruling until trial or after the Motion to Compel has been ruled on.

In *Dinsay v. RN Staff, Inc.*, the court held that evidence of discovery disputes was irrelevant and had the potential for undue prejudice.  Cause No. 1:19-cv-907, 2021 WL 2643639, at *4 (S.D. Ind. June 28, 2021).  Here, Magistrate Judge Wildeman denied Jenson's request to compel additional discovery as to other claims Lowe's has fielded relating to falling merchandise.  (Order 11, ECF No. 151.)  She found that the requirements under Rule 26(b)(1) were not met, in part because Jenson had "conceded that if there are indeed other incidents, some of them may not be relevant," and it was not appropriate for the Parties to "sort through the claims to determine what is relevant and what isn't."  (*Id.* (quoting Pl.'s Br. Supp. Mot. Compel 28, ECF No. 103).)

Defendant's MIL No. 2 is **granted** as to the filing of motions in limine and motions in general.  It is **denied** as to discovery disputes.  If Jenson establishes a prima facie case for punitive damages, the Court will entertain any further argument on whether to exclude evidence of the discovery dispute underlying punitive damages.

### 3.  Defendant's MIL No. 3: References to punitive damages during voir dire, opening statements, and until a prima facie case has been established

Lowe's argues that Jenson should be prohibited from referring to her claim for punitive damages until a prima facie case for punitive damages, that is, an entitlement to punitive damages, has been made.  Lowe's explains that it "merely requests that Plaintiff be required to offer some credible evidence showing that Lowe's alleged acts or omissions in this case warrant punitive damages, before submitting such evidence or argument to the jury." (Def.'s Mots. in Limine 5–6, ECF No. 121.)

The latter request is well-taken, *see, e.g., Barnes v. General Motors LLC*, No. 4:20-cv-00087-TWP-KMB, 2023 WL 3436098, at *5–6 (S.D. Ind. May 12, 2023) (granting motion in limine as to evidence as to what amount of punitive damages should be awarded, stating that "evidence of punitive damages should be precluded until [plaintiff] establishes that punitive damages are warranted"), and Jenson has agreed "to wait until after the Court decides she has established a prima facie claim for punitive damages before presenting evidence of Lowe's financial condition or the *amount* of a punitive damage verdict." (Pl.'s Resp. 5, ECF No. 140.)  However, she otherwise objects to this motion, contending that it would be unduly prejudicial to

prevent her from making any references to punitive damages—such as asking the venire about punitive damages or advising during the opening statement what evidence she plans to present.

In *Barnes*, the ruling on the motion in limine did not prohibit the plaintiff from referencing his claim for punitive damages in jury selection or opening statements or from offering evidence to show an entitlement to punitive damages based on the defendant's "malice or reckless indifference," 2023 WL 3436098, at *5–6; rather, the plaintiff was merely prevented from offering evidence of the amount of punitive damages, *id.*

Defendant's MIL No. 3 is **granted** to the extent that Jenson cannot reference an amount of punitive damages or present evidence regarding Lowe's financial condition or an amount of punitive damages the jury should award unless and until she establishes a prima facie case for punitive damages. Even if Jenson makes out a prima facie case, such evidence is subject to any contemporaneous objection as to admissibility. Defendant's MIL No. 3 is otherwise **denied**; subject to the Parties subsequent submission regarding the Joint Case Synopsis and voir dire questions as set forth in the Order from Final Pretrial Conference. (Order 3-5, ECF 163.) The Parties can also further address whether reference to punitive damages during opening statement should be allowed. And, obviously, Jenson may present evidence to prove her entitlement to punitive damages subject to any contemporaneous objection at trial.

### 4.  Defendant's MIL No. 4: Financial circumstances or wealth of Plaintiff

Lowe's argues that evidence or argument related to Jenson's personal financial circumstances would be irrelevant and unfairly prejudicial.  Jenson objects because she has a future lost wage claim that relates to her financial circumstances and intends to testify as to her ability to pay for various treatments.

"Generally speaking, the measure of compensatory damages in negligence actions depends upon the nature of the injuries sustained by the plaintiff and not upon his wealth or poverty.  Therefore, where only compensatory damages are recoverable, evidence is not admissible to show directly or indirectly the wealth or financial standing of the plaintiff." *Barrow v. Talbott*, 417 N.E.2d 917, 924 (Ind. Ct. App. 1981).  However, if part of the plaintiff's argument is that their injury caused them to stop working, such evidence may be admissible.  *Id.* (citing *Graves v. Thomas*, 95 Ind. 361, 365 (1884)).

Defendant's MIL No. 4 is **denied**.

### 5.  Defendant's MIL No. 5: References to the corporate character or financial wealth of Defendant in determining compensatory damages

Lowe's argues that evidence of a defendant's financial condition, wealth, and size is inadmissible until a prima facie showing for punitive damages is made.  Lowe's also argues that statements regarding its size or its ability to pay a judgment or afford counsel are irrelevant and could be unduly prejudicial.  As noted above regarding MIL No. 4, Jenson has agreed not to present evidence of Lowe's financial condition until it is determined she has established her entitlement to punitive damages.

Jenson states that financial condition and net worth may be relevant to a punitive damages claim.  The Court agrees.  *See, e.g.*, *Barnes*, 2023 WL 3436098, at *4 (denying motion in limine as to defendant's net worth).

In *Adams Laboratories, Inc. v. Jacobs Engineering Co., Inc.*, the Seventh Circuit held that the plaintiff's reference at trial "to the comparative size and financial wealth" of the parties "was improper."  761 F.2d 1218, 1226 (7th Cir. 1985).

Defendant's MIL No. 5 is **granted** to the extent that Jenson may not introduce evidence of corporate character or financial wealth of Lowe's unless and until a prima facie showing for punitive damages is made, and Jenson may not introduce evidence of the comparative financial size or wealth of the Parties.

## 6.  Defendant's MIL No. 6:  References to size or expertise of defense counsel's law firm

Lowe's argues that references to the location, size, or number of law firms that have represented Lowe's in this case would be irrelevant and have the potential to create unfair prejudice, mislead the jury, and confuse the issues.  Jenson should also be prohibited from commenting on the parties' legal fees, defense costs, and the number of counsel.  Jenson does not object.

Defendant's MIL No. 6 is **granted**.

## 7.  Defendant's MIL No. 7: "Golden rule" arguments by Plaintiff inviting the jurors to place themselves in her shoes

Lowe's argues that these kinds of arguments would appeal to the jury's prejudice and passion rather than their neutrality and would take focus away from the facts of the case.  They are "universally recognized as improper because it encourages the

jury to depart from [their] neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." *United States v. Roman*, 492 F.3d 803, 806 (7th Cir. 2007) (quoting *United States v. Teslim*, 869 F.2d 316, 328 (7th Cir. 1989)).  Jenson does not object.

Defendant's MIL No. 7 is **granted**.

## 8. Defendant's MIL No. 8: Non-disclosed and/or untimely disclosed experts or expert opinions

Lowe's argues that Jenson's experts should not offer any opinions beyond what is included and expressly disclosed in their reports.  Lowe's also seeks an order precluding any non-retained experts from testifying beyond the scope of the facts and opinions disclosed under Rule 26(a)(2)(C).  Jenson argues that Lowe's request is better left to the Court upon objection at trial.

Defendant's MIL No. 8 is **granted** subject to contemporaneous objections at trial.

## 9. Defendant's MIL No. 9: Lay opinions regarding medical causation, Plaintiff's current or future medical condition, prognoses, or the need for future treatment

Lowe's argues that neither Jenson nor other lay witnesses should be permitted to testify as to any subjective injuries alleged by Jenson, or to any diagnoses, current or future medical conditions, prognoses, or the necessity or probability of any future treatment or surgery.  Anything that requires scientific or medical knowledge must be submitted by a certified expert witness.

Jenson objects, arguing that Lowe's has already admitted liability, which included an admission as to causation, so Jenson should be able to discuss her subjective experience.

Rule 701 provides that lay witnesses cannot testify to things that are based on scientific, technical, or other specialized knowledge; lay witness testimony must be "rationally based on the perception of the witness."

Under Indiana law, a plaintiff's testimony is sufficient to establish the causation of objective injuries only; an injury is objective if it "can be discovered by a physical exam independent of a patient telling a doctor what [s]he feels." *Spinnenweber v. Laducer*, 983 F.3d 301, 304 (7th Cir. 2020) (citing *Daub v. Daub*, 629 N.E.2d 873, 877 (Ind. Ct. App. 1994)). However, an injury is subjective if it is "perceived or experienced by a patient . . . but is not directly observable by the doctor." *Id.* (alteration in original) (quoting *Topp v. Leffers*, 838 N.E.2d 1027, 1033 (Ind. Ct. App. 2005)). Jenson may testify as to her feelings and experiences, but any testimony about causation requires support from expert testimony. *Topp*, 838 N.E.2d at 1036.

An opinion regarding Jenson's prognosis or necessity for future treatment requires a reliance on medical expertise. *See Schmelzer v. Muncy*, Cause No. 3:16-cv-290, 2019 WL 3842335, at *2 (S.D. Ill. Aug. 14, 2019).

Defendant's MIL No. 9 is **denied**.

10. **Defendant's MIL No. 10: Evidence and testimony regarding witnesses named on Lowe's witness list, or witnesses equally available to both parties, but not called by Lowe's at trial**

Lowe's argues that Jenson should not be permitted to reference any witness that was named on Lowe's witness list but not called at trial and that Jenson should not be permitted to impermissibly speculate as to the probable testimony of any witness

who does not testify because this information is not relevant and will be confusing and unduly prejudicial.  Jenson does not object so long as this applies to both Parties.

Defendant's MIL No. 10 is **granted**.  Indeed, the paring down of witnesses to only those necessary is not only encouraged, but should be without penalty to either Party.

## 11. Defendant's MIL No. 11: Evidence concerning Lowe's policies and procedures

Lowe's argues that store policies do not establish a standard of care or create a legal duty and liability has already been admitted, so arguments regarding violations of internal policies would be irrelevant and unfairly prejudicial.  Additionally, allowing the use of such policies as evidence to support a punitive damages claim could dissuade the creation of such corporate policies and procedures.

Jenson argues that Lowe's is conflating admissibility with standard of care.  Jenson is not suggesting a one-time violation but rather that Lowe's employees deliberately and routinely put people at risk by ignoring safety guidelines, and that Lowe's management showed little concern with those acts and omissions.

The fact that internal policies exist does not establish a standard of care, a duty, or a breach of that standard or duty.  *Wal-Mart Stores, Inc. v. Wright*, 774 N.E.2d 891, 894–95 (Ind. 2002).  This is not relevant to liability here since Lowe's has already admitted liability.  However, *Wal-Mart* did not hold that evidence of the store policies was inadmissible.  And Lowe's offers no authority for the proposition that its admission of liability negates the relevance of a failure to follow internal policies.  Lowe's is free to argue that its internal  policies and procedures exceed the standard of care.  For the reasons Judge Dinsmore in *Gannon v. Menard, Inc.*, No. 1:18-cv-

21

0251-JMS-MJD, 2019 WL 7584294, at *7–8 (S.D. Ind. Aug. 26, 2019), denied a motion in limine to exclude the defendant store's policies, procedures, and instructional videos, which reasons are persuasive and sound, Defendant's MIL No. 11 is **denied**.

12. **Defendant's MIL No. 12: References to other incidents, claims, or lawsuits against Lowe's**

Lowe's argues that evidence of prior or subsequent accidents do not indicate with any reliability whether Lowe's was negligent on this occasion, which has already been admitted. Additionally, Lowe's argues that its probative value would be outweighed by unfair prejudice and that Lowe's will be forced to defend itself regarding the circumstances of each other accident or incident, which would substantially lengthen the trial with little probative value and a high risk of undue prejudice.

Jenson objects, arguing that this information is relevant to the issue of whether Lowe's deliberately placed dangerous merchandise on top shelves in ignorance of its safety policies and whether these incidents are common. "[E]vidence of prior or subsequent negligent acts is generally not admissible to show the defendant was negligent in a particular incident unless the proponent of the evidence lays a foundation of similar circumstances between the incidents." *Van Bree v. Harrison County*, 584 N.E.2d 1114, 1120 (Ind. Ct. App. 1992). But evidence of other similar incidents—merchandise unexpectedly falling from upper or top shelving and striking customers—may be relevant to show Lowe's knowledge of the danger. *See Weir v. Crown Equip. Co.*, 217 F.3d 453, 457 (7th Cir. 2000) (products liability). In addition, for punitive damages, evidence of prior or subsequent negligent acts can be

admissible if they demonstrate that a defendant's acts were willful and wanton or grossly negligent.  *See Davidson v. Bailey*, 826 N.E.2d 80, 85–86 (Ind. Ct. App. 2005).

Defendant's MIL No. 12 is **denied**, subject to contemporaneous objections at trial.

### 13. Defendant's MIL No. 13: Evidence and testimony regarding statements by counsel

Lowe's argues that statements by counsel are not evidence and should not be admitted.  This extends to statements in depositions, statements in submissions to the Court, and statements concerning discovery disputes, dismissal of prior defendants, or the admission of liability.  This would be prejudicial and would mislead or confuse the jury.

Jenson objects only to the extent that Lowe's counsel signing discovery responses on behalf of Lowe's is considered a "statement of counsel," since Jenson contends that the discovery responses are relevant to her punitive damages claim.

Defendant's MIL No. 13 is **denied** subject to contemporaneous objection at trial.

### 14. Defendant's MIL No. 14: Emotional distress caused by this litigation & the fact that Lowe's previously did not admit liability

Lowe's argues that evidence of emotional distress caused by the litigation is irrelevant to the damage caused by the negligence itself.  Additionally, this would open the door for Lowe's to present evidence of failed settlement negotiations for the purpose of showing that Jenson had previous opportunities to avoid alleged stress or anxiety associated with ongoing litigation (i.e., not in violation of Rule 408).  Additionally, Lowe's seeks to preclude Jenson from introducing evidence tending to

show that Lowe's previously denied liability because it would be irrelevant, confusing, and unfairly prejudicial.

Jenson objects, arguing that she has suffered mental anguish over Lowe's intentional conduct during the course of this lawsuit such as bad faith refusal to admit liability until shortly before trial.

The Court finds that such evidence would be both irrelevant and unduly prejudicial.  Fed. R. Evid. 401, 403.  In *Barnes v. General Motors LLC*, the court granted the defendant's motion in limine seeking to exclude any evidence of emotional distress caused by litigation on the grounds that a litigant who brings suit cannot increase their damages this way and may recover for only the emotional distress caused by the alleged wrong.  Cause No. 4:20-cv-87, 2023 WL 3436098, at *5 (S.D. Ind. May 12, 2023).  Any reference to Lowe's previous denial of liability would be irrelevant to determining the extent of Jenson's injuries as well as the determination of punitive damages, if such a claim can go forward.  Jenson's punitive damages claim is not at all based on Lowe's denial of liability in the instant suit.  Jenson's objection imputes bad faith to Lowe's without evidence to support this claim and does not produce any legal citations to support a difference in treatment for stress caused by litigation generally and stress caused by alleged "intentional conduct."

Defendant's MIL No. 14 is **granted**.

## 15. Defendant's MIL No. 15: Evidence and testimony regarding the truthfulness of other witnesses

Lowe's argues that witnesses may not testify to opinions concerning whether another witness has testified truthfully; this would invade the province of the jury.

24

Additionally, such testimony would be irrelevant because one witness's opinion that another person has lied does not make it more or less likely that the person lied.

Jenson objects, arguing that Rule 608 allows a witness to testify about another witness's credibility in certain instances. Additionally, Jenson argues that Plaintiff's counsel is entitled to contend that certain witnesses were credible or not credible during closing argument.

Rule 608 permits a witness to testify about the truthfulness of another witness in the form for testimony regarding their reputation or opinion testimony. Specific instances of untruthfulness are permitted only on cross-examination. A witness may not opine that another witness's *testimony* was or was not truthful; it is a key function of the jury to evaluate witnesses' credibility. *United States v. Nunez*, 532 F.3d 645, 652 (7th Cir. 2008). However, this does not mean witnesses cannot offer testimony as to whether the witness has a reputation for truthfulness or whether they believe the witness is truthful. The jury will evaluate those witnesses' credibility as well. Additionally, because witnesses will be separated, most witness will not hear another witness's testimony.

"The credibility of a witness's testimony is, under appropriate circumstances, fair game in closing arguments." *Probus v. K-Mart, Inc.*, 794 F.2d 1207, 1211 (7th Cir. 1986) (no grounds for reversal where defense counsel was discussing weaknesses of plaintiff's case and jury was instructed that closing arguments are not evidence).

Defendant's MIL No. 15 is **denied**, subject to proper objection at trial should testimony fall outside the bounds of Rule 608.

16. **Defendant's MIL No. 16: Testimony regarding what Plaintiff or other witnesses were told by healthcare providers**

Lowe's argues that this testimony would be hearsay and would not fall under the medical treatment exception of Rule 803(4) because this applies only to statements made to medical personnel, not statements made by medical personnel.

Jenson objects, arguing that there are many reasons why discussions between Jenson and her doctors may arise at trial; a blanket ruling precluding any such evidence is premature.

Any statements made by healthcare providers to Jenson or other witnesses that are offered for the truth of the matter asserted in the statements are hearsay. Rule 801(c). The exception under Rule 803(4) does not apply to statements made by medical providers. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 564 (7th Cir. 1996) (holding that plaintiff's testimony regarding a doctor's statement to establish his ability to perform job functions was inadmissible).

Defendant's MIL No. 16 is **granted**. This is not a "blanket ruling" on discussions between Jenson and her doctors but merely bars lay witnesses from testifying about what Jenson's healthcare providers told them.

17. **Defendant's MIL No. 17: Evidence of future medical care, prescriptions and/or costs**

Defendant's MIL No. 17 is **denied** consistent with the above ruling on in light of the Court's above ruling on the *Daubert* motion.

### III. Plaintiff's Motions in Limine (ECF No. 122)

Jenson seeks to exclude the following evidence:

1.  **Plaintiff's MIL No. 1: Collateral source payments that Jenson received such as Workmen's Compensation benefits, governmental benefits such as Social Security, Veteran's benefits, or insurance benefits**

Jenson cites to Indiana Code § 34-44-1-2, which provides that "the court shall allow the admission into evidence of" (1) collateral source payments "other than . . . (B) insurance benefits that the plaintiff or members of the plaintiff's family have paid for directly."

Lowe's objects to the extent that Jenson seeks to prevent Lowe's from introducing into evidence any payments under *Stanley v. Walker*, 906 N.E.2d 852 (Ind. 2009). In *Stanley*, the Indiana Supreme Court held that evidence of collateral source payments is admissible so long as it is being introduced to prove that the treatment expense was reasonable. 906 N.E.2d at 856.

Plaintiff's MIL No. 1 is **denied**.

2.  **Plaintiff's MIL No. 2: Similar or dissimilar injuries to plaintiff Shelby Jenson from prior or subsequent incidents of any kind unless Lowe's can show a causal connection between her current injury and these incidents by competent medical evidence**

Jenson argues that this testimony should be excluded under Rule 403 because it would "have no probative value and would be calculated to mislead and confuse the jury, and work to the prejudice of the Plaintiff."

Lowe's objects, arguing that the law does not require that the connection between the previous injury and Jenson's claimed injuries to be shown by competent medical evidence.

"Evidence concerning prior similar injuries may be admissible for both substantive and impeachment purposes." *Couch v. Wal-Mart Stores, Inc.*, 1999 WL

623454, at *4 (7th Cir. 1999) (citing *O'Shea v. Jewel Tea Co.*, 233 F.2d 530, 532 (7th Cir. 1956)); *see also Rondinelli v. Bowden*, 293 N.E.2d 812, 814–815 (Ind. Ct. App. 1973).

In *Rondinelli*, the Indiana Court of Appeals noted that evidence of a prior injury is admissible to show that the present injury is due to some other cause "where a causal relationship between them can be shown" and where the evidence is "elicited in good faith; not for the purpose of prejudicing the jury." 293 N.E.2d at 814–815. The opinion does not speak to whether "competent medical evidence" need be given to show the connection. *See id.*

In *Walker v. Cuppett*, the Indiana Court of Appeals stated that the opinions of expert witnesses can be "questioned or refuted by other evidence, even if that evidence does not come in the form of another expert's testimony." 808 N.E.2d 85, 95 (Ind. Ct. App. 2004). This suggests that indeed, a lay witness can cast doubt on an expert's opinion that Jenson's injuries were caused by the conduct complained of.

Plaintiff's MIL No. 2 is **denied**.

3.  **Plaintiff's MIL No. 3: Evidence of hearsay within medical records containing opinions by persons whose expertise has not been established**

Jenson argues that where a party seeks to admit medical or hospital records that contain opinions, they must establish the expertise of the person who gave the opinion. Although experts can base their opinions on hearsay, they cannot testify about hearsay medical opinions. Lowe's does not object.

A testifying expert can rely on hearsay, including another expert's opinion, but cannot speak to the truth of that other expert's opinion. *Matter of James Wilson Assocs.*, 965 F.2d 160, 172–73 (7th Cir. 1992). "While Rule 703 entitles experts to base their opinion on [hearsay], the rule does not address the admissibility of the underlying information," which "still is subject to exclusion under the balancing test of Rule 403." *Gong v. Hirsch*, 913 F.2d 1269, 1273 (7th Cir. 1990).

Plaintiff's MIL No. 3 is **granted**.

### 4.  Plaintiff's MIL No. 4: Any healthcare treatment Defendant intends to offer into evidence that is unrelated to the conditions in issue

Jenson argues that treatment that is unrelated to the conditions in issue is irrelevant and privileged from discovery. This privilege is waived only if the matters have a direct medical relevance to the claim, counterclaim, or defense being made. Lowe's does not object.

There is no federally recognized physician-patient privilege. *See Northwestern Memorial Hosp. v. Ashcroft*, 362 F.3d 923, 926 (7th Cir. 2004). In diversity cases such as this one, however, the court may refer to state privilege rules where applicable. *See Patterson v. Caterpillar, Inc.*, 70 F.3d 503, 506–07 (7th Cir. 1995).

In Indiana, a plaintiff in a personal injury suit waives the physician-patient privilege as to only those matters that have a "direct medical relevance to the claim, counterclaim, or defense made." *Canfield v. Sandock*, 563 N.E.2d 526, 529 (Ind. 1990) (quoting *Collins v. Bair*, 268 N.E.2d 95, 101 (Ind. 1971)). "[M]edical information which is unrelated to the condition in issue . . . remains privileged." *Id.* at 530.

Plaintiff's MIL No. 4 is **granted**.

### 5. Plaintiff's MIL No. 5: Any reference and/or evidence Defendant tends to introduce that the treatment for Plaintiff's injuries amounted to medical negligence or malpractice

Jenson argues that Lowe's should be precluded from disputing the medical judgment of Jenson's medical providers in choosing to administer studies and treatment. Lowe's does not object.

In *Sibbing v. Cave*, the Indiana Supreme Court upheld the trial court's exclusion of evidence proffered by the defendant that "dispute[d] the medical judgment of the plaintiff's medical providers." 922 N.E.2d 594, 604 (Ind. 2010).

An injured plaintiff can recover for "any aggravation of [the original] injuries caused by a physician's improper diagnosis and unnecessary treatment or proper diagnosis and negligent treatment. In order to recover under this rule, the plaintiff need only show he exercised reasonable care in choosing the physician." *Sibbing*, 922 N.E.2d at 602 (quoting *Whitaker v. Kruse*, 495 N.E.2d 223, 226 (Ind. Ct. App. 1986)).

Plaintiff's MIL No. 5 is **granted**.

### 6. Plaintiff's MIL No. 6: Any prior settlement discussions, proposals, negotiations, or alleged settlement

An offer to compromise or settle a claim is not admissible to prove liability. Fed. R. Evid. 408. Lowe's does not object. Plaintiff's Motion in Limine No. 6 is **granted**.

### 7. Plaintiff's MIL No. 7: Any testimony by previously undisclosed or untimely disclosed witnesses on behalf of the Defendant

Lowe's does not object.

Plaintiff's MIL No. 7 is **granted**.

8. **Plaintiff's MIL No. 8: Any reference to the tax consequences, if any, of a verdict**

If a party so requests, Indiana statute requires the court to instruct the jury not to consider the tax consequences, if any, of its verdict.  Ind. Code § 34-51-5-1.  Lowe's should not be allowed to make any argument, suggestion, question, or inference that any verdict would not be subjected to tax consequences.  This information would be irrelevant and would confuse, mislead, and prejudice the jury.  Lowe's does not object.

Plaintiff's MIL No. 8 is **granted**.

9. **Plaintiff's MIL No. 9: Any argument, suggestion or indication of any kind that the Defendant may be financially harmed, any comments as to Defendant's lack of capital or assets and any suggestion by the Defendant's counsel, or witnesses, that a judgment or verdict rendered in this matter for compensatory damages would raise prices to consumers of their stores**

Jenson argues that this would be an improper attempt to sway the jury's emotions and is inadmissible under Rule 403.  Evidence of financial status is generally not admissible.  The fact that Lowe's is insured is generally inadmissible, but Lowe's may open the door to this fact if it offers evidence or arguments of that nature.

Lowe's argues that Plaintiff should not be able to present any evidence of Lowe's financial condition and size until a prima facie case for punitive damages has been established outside the presence of the jury.

The Court first notes that the prima facie case for punitive damages is not established outside the presence of the jury.  When Jenson makes out a prima facie case for punitive damages (entitlement to punitive damages), she will do so by presenting evidence in front of the jury.  The Court will then determine whether she has indeed established a prima facie case with the evidence presented before she can

offer further evidence toward the amount of punitive damages.  *See, e.g.*, *Genesys Cloud Servs., Inc. v. Talkdesk, Inc.*, Cause No. 1:19-cv-695, 2023 WL 2354806, at *1 (S.D. Ind. Mar. 3, 2023).

If the Court finds that Plaintiff has not established a prima facie case for punitive damages, then the jury will not be instructed on punitive damages and the Court may give a limiting instruction that the evidence presented in support of Plaintiff's claim for punitive damages should not be considered in its determination of how much Plaintiff is entitled to in compensatory damages.

If the Court finds that Jenson has presented sufficient evidence to the jury to make her case for punitive damages, she may introduce evidence of Lowe's financial condition.  *Riverside Ins. Co. v. Pedigo*, 430 N.E.2d 796, 808 (Ind. Ct. App. 1982). Then and only then, Lowe's may introduce evidence of its financial condition. However, the defendant cannot introduce such evidence as an independent defense to punitive damages unless the "plaintiff has first offered evidence of [the] defendant's wealth for the purpose of enhancing a punitive damage award."  *Henrichs v. Pivarnik*, 588 N.E.2d 537, 544 (Ind. Ct. App. 1992).

Plaintiff's MIL No. 9 is **denied**.

10. **Plaintiff's MIL No. 10: Any reference to interest earnings on a damage award**

Jenson argues this would confuse the jury and add speculative, immaterial, and irrelevant considerations.  No mention of possible interest, dividends, or annuities should be made to the jury to suggest or solicit a reduction in a verdict award on the

basis of its value being increased by interest, dividends, or future investment options.

Lowe's does not object.

Plaintiff's MIL No. 10 is **granted**.

11. **Plaintiff's MIL No. 11: Any reference, evidence, or suggestion that any person, corporation, or other entity, not a party to this action, may have been at fault in causing the damages that are the subject matter of this case**

Jenson argues this should be excluded because there are no issues regarding any nonparties and Lowe's has admitted 100% of the liability and causation.  Under Indiana Code § 34-41-2-16, a nonparty defense must be pleaded in the party's answer. Lowe's has not done so here.  Lowe's does not object.

Plaintiff's MIL No. 11 is **granted**.

12. **Plaintiff's MIL No. 12: Any reference, evidence, or suggestion concerning other lawsuits to which Plaintiff might have been a party**

"As a general matter, 'a plaintiff's litigiousness may have some slight probative value, but that value is outweighed by the substantial danger of jury bias against the chronic litigant.' There are rare exceptions when the evidence is admitted for reasons other than to show the plaintiff's litigious character and it is sufficiently probative to survive Rule 403 balancing." *Nelson v. City of Chicago*, 810 F.3d 1061, 1071 (7th Cir. 2016) (quoting *Mathis v. Phillips Chevrolet, Inc.*, 269 F.3d 771, 776 (7th Cir. 2001)). Lowe's does not object.

Plaintiff's MIL No. 12 is **granted**.

13. **Plaintiff's MIL No. 13: Any reference, evidence, or suggestion by Defendant or its counsel that a verdict in favor of Plaintiff would increase insurance rates or tax rates**

Jenson argues this information is irrelevant and would be an improper appeal to the bias, prejudice, and pecuniary interest of the jurors. Lowe's does not object.

Civil plaintiffs are "entitled to a jury composed of impartial and unbiased persons," which gives them "the right to make a reasonable inquiry into any financial interest a juror might have in the outcome of the trial which might have skewed the juror's otherwise impartial approach to the evidence." *Rohrkaste v. City of Terre Haute*, 470 N.E.2d 738, 741 (Ind. Ct. App. 1984). For example, in *United States v. Trutenko*, the Seventh Circuit found that it was "undeniably improper" for a prosecutor to imply that jurors should find the defendant guilty of insurance fraud because insurance companies paying out false claims increases customers' rates. 490 F.2d 678, 679 (7th Cir. 1973).

Plaintiff's MIL No. 13 is **granted**.

14. **Plaintiff's MIL No. 14: Any reference, suggestion, or argument that Plaintiff's case is fraudulent, including suggestion that Plaintiff's stated symptoms are/were not truthful, that Plaintiff is exaggerating her injuries, that Plaintiff is overreaching, or anything along the lines of fraud**

Jenson argues that Lowe's has not pleaded that Jenson's claims are fraudulent, so any reference, suggestion, or argument to that effect would be irrelevant and would serve only to inflame the jury.

Lowe's objects to the extent that this motion seeks to limit Lowe's ability to assess the reasonableness and necessity of Jenson's past and future medical treatment and expenses.

"In order to recover an award of damages for medical expenses, the party seeking to recover those damages must prove that the expenses were both reasonable and necessary." *Burge v. Teter*, 808 N.E.2d 124, 132 (Ind. Ct. App. 2004). Therefore, Lowe's can inquire into whether Jenson's expenses were reasonable and necessary. However, arguments that Jenson is falsifying or exaggerating her injuries would be unfairly prejudicial in determining an award for compensatory damages. Fed. R. Evid. 403.

Plaintiff's MIL No. 14 is **denied**.

15. **Plaintiff's MIL No. 15:  Photographs or videos of Plaintiff taken during surveillance on October 5–6, 2023 and November 24, 2023**

Jenson argues that photos and videos of her taken during surveillance on October 5 and 6, 2023, and November 24, 2023, should be excluded because they were first disclosed on January 30, 2024, less than 30 days before the close of discovery. Lowe's did not produce the videos, according to Jenson, until February 12, 2024. Apparently as of the March 14 filing of objections to Jenson's motion in limine, Lowe's has not produced the photos to supplement its responses to Jenson's request for production. Jenson argues that the three-month delay in disclosing the surveillance videos and photos violates Rule 26(e)'s requirement to supplement or correct disclosures in a timely manner. Because of this delay, she argues, she is deprived of the opportunity to prepare her case and counter any effects of the video and photos at trial.

Lowe's objects, arguing that surveillance footage is discoverable only after a party decides to use that footage at trial, in part because surveillance footage obtained in anticipation of litigation is protected by the work-product doctrine. Jenson was

deposed on October 5, 2023.  Lowe's decided to use the surveillance footage at trial on January 30, 2024, and then produced the video less than two weeks later.

Rule 26(e)(1)(A) requires a party to supplement or correct its disclosure or response "in a timely manner."  A party that does not comply with this rule "is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  To determine whether any failure is harmless, the district court should consider "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) that party's ability to cure any prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).

The Court does not find that any delay in production warrants the exclusion of the evidence at trial.  Lowe's did not obtain the photos and videos until after Jenson's deposition (apparently in response to her deposition testimony) for purposes of this litigation as well as in anticipation of trial.  Lowe's plans to use the videos for impeachment purposes only to dispute the nature and extent of Jenson's treatment and injuries.  Since the videos were obtained after Jenson's deposition in October, created for impeachment purposes, and disclosed shortly after Lowe's decided to use them at trial and within the time for damages discovery, the disclosure of the video on February 12, 2024, seems timely.

Jenson's need for the video footage and photos to have the opportunity to prepare for trial is more limited than if they were being used substantively for liability

purposes, *see Schroeder v. Menard, Inc.*, No. 2:13-cv-451-RLM-JEM, 2014 WL 3084725, at *6 (N.D. Ind. July 7, 2014) (recognizing different needs for video depending on whether it was to be used to prepare the substance of the case or solely for impeachment); Jenson need only prepare to counter the potential impeachment effects of the video and photos. And since the photos and video are of Jenson, her appearance and activity at the time they were taken should come as no surprise.

Plaintiff's MIL No. 15 is **denied** as to any surveillance photographs or videos of Jenson of Jenson taken on October 5–6, 2023, that were disclosed to Jenson on or before February 12, 2024.

It is unclear to the Court whether Lowe's intends to offer any photos and whether those photos, like the videos, have been disclosed. But if so, Plaintiff's MIL No. 15 is **granted** to the extent that Lowe's must bring the matter to the Court's and Jenson's attention before offering any undisclosed photos.

## 16. Plaintiff's MIL No. 16: The Claim Scout Report prepared by Magna Legal Services dated January 25, 2024

Regarding the Claim Scout Report, Jenson makes a similar argument as in MIL No. 15, and Lowe's makes a similar objection. For the same reasons, Plaintiff's MIL No. 16 is **denied**.

## 17. Plaintiff's MIL No. 17: The fact that Plaintiffs filed this Motion in Limine or that the Court ruled in response

Jenson argues that references to motions in limine are inherently prejudicial because they suggest that the moving party has sought to prohibit proof or that the

Court has excluded proof of matters damaging to the moving party's case.  Lowe's does not object.

Plaintiff's MIL No. 17 is **granted**.

### IV.    Conclusion

Defendant's *Daubert* motion, (ECF No. 112), is **denied**. Defendant's Motion in Limine, (ECF No. 121), is **granted in part** and **denied in part**.  Plaintiff's Motion in Limine, (ECF No. 122), is **granted in part** and **denied in part**.  These rulings in limine are preliminary and subject to contemporaneous objection made at trial.

**SO ORDERED**.

Date: 03/29/2024

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution to all counsel of record via CM/ECF